Next we'll hear Linde v. Arab Bank. Good morning, Your Honors, and may it please the Court. Paul Clement for the appellants. I'll endeavor to save two minutes for rebuttal. The District Court committed three fundamental errors that require reversal or, at a minimum, a new trial. First, the District Court simply refused to instruct the jury on the four statutory elements of international terrorism as defined by 18 U.S.C. 2331-1. The District Court operated under the erroneous assumption that a jury finding of the elements of the least demanding material support provision, 2339-B, ipso facto satisfied the statutory elements of international terrorism under 2331-1. That is flatly and demonstrably wrong. Finding a violation of 2339-B satisfied one, but only one, of the four statutory elements of the definition of international terrorism. The jury still needed to be instructed on the other four elements, including the apparent intent to terrorize a civilian population or change government policy, and the separate element that it's an act that is either violent or dangerous to human life. May I be certain that I understand your argument on this? I don't understand you to be arguing that no material support conduct could ever satisfy the definition of international terrorism. You're just arguing to us that it's not every act of material support that so clearly does so that the jury does not have to be charged. That's exactly right, Your Honor, and if you want to think of them as Venn diagrams, I mean, there is overlap. There are some 2339-B prosecutions or, you know, finding of the elements of that that would constitute an international terrorism under the statutory definition, but the overlap is, you know, it's not complete. The two diagrams do not overlap with each other, and so it is simply erroneous to say, as the district court judge did here, I don't have to instruct on the statutory elements of 2331-1 because I'm just going to give the jury an instruction on 2339-B. I think that is just flatly wrong. I think that independently of the other errors that I'm happy to talk about as well, I think that independently requires a new trial because the jury just wasn't instructed on those critical elements of the definition of international terrorism. Because it was a civil case, we have more flexibility in how this is charged. Let me ask you, the first requirement, 1A, is that the activities involve violent acts or acts dangerous to human life, and so let's use the verb involve. I mean, it suggests to me, if it has its common everyday meaning, that the violent acts have to be subsumed within the activities. That doesn't suggest that the activity itself, the international terrorism, has to be the violent act. Do you construe it differently? I do, Your Honor, but I think that's, I mean, to be clear, I think all of that is stuff that could have been sorted out in a jury instruction conference if we had the elements of the statutory definition before the court at all. So I think all of that is subsumed. I mean, I think that, you know, and I can understand that there might be reasonable grounds for disagreement on this, but I think that to make sense of the statutory provision, and by that I mean 2333A, that provides this civil liability, I think that has to focus on the activities of the defendant that is, you know, trying, that civil liability is attributed against. I think that's even more clear now that JASTA has been passed, and you have 2333D, because you now do have secondary liability under the statute, and I think that if you're trying to still use primary liability, which is the theory under which the jury was instructed here, it has to be the liability of the defendant, and it has to be their actions that satisfy the four elements, and I don't think you can sort of swap over to somebody else, like Hamas, for example, just by using the word involved. But we didn't even get to the point of having that debate because the judge was so clear about the idea that 2339B and instructing about that was sufficient. I do think if I may transition to the issue of causation, I think that's another place where the combination of this Court's precedence and now the JASTA statute I think really call into sharp, put into sharp relief the failure here of the district court to require but-for causation, and I also think it shows that there is insufficient evidence in this record for proximate causation. If I could start with but-for causation, I think that, you know, I read this Court's decisions in Rothstein and in re-terrorist attacks as certainly going a long way to saying there has to be but-for causation in these cases. The Court, to be sure, in both cases was focused on proximate causation, but the Court's reasoning, which is essentially that by reason of is not language that came out of the ether, but it's language that came from the antitrust laws and it came from RICO, and it has an understood meaning which is both but-for causation and proximate causation. And then one thing that this Court didn't have the benefit of in either of those previous decisions, and many of the district courts that have gone the other way on this didn't have the benefit of, is the Supreme Court's decision in Burrage, which I think is really I think takes away the last bit of clarity on, because the Supreme Court in Burrage makes crystal clear that the default assumption is that a statute that uses causation language requires but-for causation. Your adversary relies on Paroline and a different kind of analysis about causation in the very specific setting where a wrong has been done, and it's virtually impossible to trace in a very specific way to a wrongdoer's act, although it's clear that a wrongdoer has contributed in some marginal way at least to the wrong. Why are they incorrect in relying on Paroline? Well, they're sort of doubly incorrect. So the principal reason they're incorrect is Paroline itself understood that it was deviating from the normal rule, and its deviation from the normal rule was coupled with a special rule to avoid sort of extreme liability for the defendant, which was they got rid of joint and several liability at the same time. What my friends want is the benefit of the Paroline relaxation of causation and then combine it with joint and several liability and combine it with treble damages, and there's no precedent for allowing that. I think the other thing, though, is Burrage is a post-Paroline, if I have the timeline here right, and I think Burrage makes clear that Paroline was a deviation from the normal rule, and I think Burrage underscores that the assumption of the normal rule is that you get but-for causation. The Supreme Court, and this is where I think Burrage is so helpful because, you know, where the Seventh Circuit got a little bit off of track here was it pointed to the possibility of independent and sufficient causation. Burrage, I think, quite correctly says, well, you know, that might be a well-established exception to the general rule for but-for causation. We don't have to decide the issue because we don't have before it in the Supreme Court and Burrage didn't have before it independent and sufficient cause. That's exactly the same here. These are not — nobody, I think, takes the position that these are sufficient. The role of my clients was a sufficient cause. Mr. Clement, one of the problems I have with your causation argument, which depends so heavily on the parallel of language between RICO and the Clayton Act and some of the language in 2333 is with the expressed congressional intent concerning 2333, which went out of its way to say that the point of 2333 was to allow a U.S. national who's been injured by an act of terrorism to sue and then went on to say the substance of such an action is not defined by the statute because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts. This bill opens the courthouse door to victims of international terrorism. Now, your but-for causation argument, it seems to me, tosses that language out the window and would substitute, if adopted, a situation where somebody providing material support of a financial nature could never be held liable except in the most unimaginable circumstances because of the fungibility of dollars. So a couple of responses, Judge Kaplan. I mean, first of all, with all due respect, this isn't something that I came up with entirely on my own. I think the reliance of the prior statutes, the antitrust laws and the RICO statute, that's directly from Rothstein, and I don't understand why the logic of that, which the court clearly applied to proximate causation, wouldn't also apply to but-for causation when the Rothstein court itself and the in-ray terrorist attack courts themselves quoted the language from Holmes that talked about but-for causation. But if I could, I don't want to just prevent, you know, I mean, that's kind of a tough love answer, and I don't want to leave you with just a tough love answer because I think this becomes much... I don't either, Your Honor, but I don't have, when I'm talking to my teenagers, JASTA. And I really think the fact that Congress has now come in and provided an express cause of action for aiding and abetting when it takes the form of substantial assistance and conspiracy, I think that really kind of solves the problem that got the Seventh Circuit in Boham kind of twisted in knots. ...not committing the act of terrorism. Indeed, aiding and abetting liability can be for a non-criminal act. Now we're talking about people who satisfy at least the criminal act prong of the act of international terrorism. And it seems to me that that may very well be a difference here, that when you are engaged in an act of international terrorism, and I know it's debatable whether that's what was here, but if you were, there's not the concern that you've just identified. There might be an aider and abetter who, you know, drives somebody to the airport or does something else that in and of itself is not illegal. No, I understand, and I'm not trying to suggest that the addition in JASTA of aiding and abetting liability eliminates primary liability. Far from that. What I'm saying, though, is the thing that I think has caused concern is that when you're thinking about primary liability, you're thinking about the traditional requirements including causation. And I think that, you know, given the by reason of language and given the instruction that comes from Rothstein and from in-ray terror attacks and from Burrage, I'm left with the almost unescapable conclusion that causation means both but-for and proximate causation. Tell us why you don't think that they've even satisfied proximate causation, because you said that you would take that position, too. Yes, I don't think they have here, because if you look at, you know, out of the entirety of this litigation, we now on appeal have three attacks. There are 24 attackers from those three attacks. They have not been able to point to any evidence that any of those 24 received funds. You know, the principal evidence they did have access to was the records from the Saudi fund. None of the 24 attackers had received funds from the Saudi funds. The closest they could come as to one of the three attacks, they had two relatives of one relative each for two of the attackers who got transfers from the Saudi committee more than two years before the relevant attacks. Now, I think with respect, that is insufficient, especially when you're trying to put liability on a bank. We're not talking even about what the Seventh Circuit had before it, which was the charity as the defendant. But you're getting pretty far away from the primary action when you're going after a bank. I'm not saying you can never go after a bank. But when you are, I think you do have to look to the real requirements of proximate cause, and I just don't think the evidence here satisfies that. I think it is, you know, comparable to the allegations that were before the court in In re terrorist attack with respect to El Raji Bank and the 9-11 attacks. I think here we had a trial. To be sure, the trial was profoundly affected by the sanctions order, which I haven't talked about. But they did have some evidence. I think Judge Weinstein had the way that a district court should look at a situation where you have a sanction order, but you have evidence. I think he had that exactly right, which is, you know, the fact that there's the possibility of an inference, even if you're supposed to have an inference. You still have to look at the evidence, and you still have to make a decision about whether or not what's actually in the record is sufficient evidence, and here there just isn't sufficient evidence of proximate cause for these attacks. Your adversary will speak for himself, but as I understood the argument from the brief, the suggestion is that the material support for terrorism was satisfied in this case by helping with the finances of Hamas in general. That's the terrorist organization for which support was provided. And then the argument is that by doing that, by basically acting as a bank for Hamas' financial transactions, the bank basically let Hamas and its actors know that there would be a means for paying suicide bombers, families, et cetera. And it's in that sense that the argument is made that there was proximate cause. Now, there may be other arguments as well, but tell me why you think that's inadequate. Well, I think that's just too indirect. I also think that it sort of abstracts out from the actual facts that are in the record here, which is, you know, this isn't a situation where, you know, this financial assistance to Hamas was provided in circumstances where this was the only bank that would do transactions for these individuals. I mean, if they had evidence of that, then maybe they'd have a theory as to why they had but-for causation. But this is a situation where what the defendant is accused of is providing essentially routine banking services to individuals who eventually, it turned out, were affiliated with Hamas. Looking at it less favorably to your client, that they provided the assurance that money from supporters not on site would always get to the Hamas operatives who carried out the bombings because there were banks that were willing to do it. That's the argument cast most favorably to the plaintiff. I think it is, Your Honor, and I guess what I'm saying is that's just too indirect to satisfy proximate cause. If you take that general theory and then you can actually trace the payments from the Saudi committee to these individual perpetrators, you know, the 24 for the three attacks, then maybe that's enough to satisfy proximate cause. I mean, if you were a messenger who got on a plane from New York to Gaza with, you know, a suitcase full of money, that would be one thing, and instead a bank transfers the money. Why is that different? Well, I mean, first of all, I would think that you would still want to, you would still, if proximate cause is going to mean what it means in any other context, you'd still want to get that messenger and trace that suitcase to particular attacks. I also think, though, that that does sort of, you know, this is not a situation, because, you know, the thing about the suitcase that makes it more problematic is there you have a mechanism for getting cash that goes outside the banking system. And here you have essentially, you know, allegations, and I think the evidence bore this out, that this was done through the banking system. This was not a situation, and I can imagine a situation, where the allegations or the evidence shows that this is a dirty bank and it's the only bank in the world that would have cleared these transactions. But that's not what the evidence here shows. But with respect to proximate cause, I mean, aren't we entitled to look at the provisions that Congress enacted in 2339A, which identify specifically providing financial services as providing material support that's subject to criminal penalty? Why shouldn't that policy judgment inform our view about proximate cause in this circumstance? Well, I think it can to a point. I mean, which is to say, I'm not here arguing that material support is not sufficient to satisfy one of the elements of international terrorism. It does, the crime. But wholly independent of satisfying the definition of international terrorism, you then have to show causation. And when you get to proximate causation, the fact that money went to the, you know, Hamas through individuals who were not on lists at the time of the transaction, I just don't see anything in the material support statute that provides a signal that Congress thought that was sufficient for proximate cause. And if it were, I'm not so sure that In re Terror Attack and El Raji Bank would have been treated the same. Because I think the allegations there mirror pretty closely what the evidence here showed, which is, you know, if you want to have legitimate banking services in the Middle East, and this is really, I think, gets to the dilemma that my clients face, and really the United States faces, which is why they filed a supportive amicus brief that referred to the Arab Bank as a constructive partner in fighting terrorism finance. I mean, if it becomes the law that if you provide legitimate banking services in the Middle East, and some of your customers turn out later to be terrorists, that that's enough to impose civil liability, then what's going to happen is there are going to be no legitimate banking services provided, say, in the Palestine territories. If you are right on your first point, if you are right that for material support to lead to civil liability, the jury has to find also on sufficient evidence that the acts in question appear to be intended to intimidate or coerce, to influence government policy by intimidation or coercion, et cetera. Then you have a requirement of knowledge on the part of the bank that what it is doing is dirty, and it doesn't touch other banks who aren't in that position. Well, I will certainly, I think, Jeff Kaplan, you can understand my rhetorical argument about threatening banking, legitimate banking in the Middle East as essentially subsuming all of the heirs, which my point is if everything that the district court did here was correct, which is avoid the precise elements that I agree with you, would limit the statute. I basically took your argument to be, number one, addressed approximate cause because that's the point you've been on for quite a while now, and I don't mean to be snide or to criticize, I'm just descriptive. That's what you're talking about. And there was the characterization of what the bank did as routine banking services, which had one level of generality, of course, is precisely true. They took deposits, they made disbursements, they posted things to ledgers, and the same could be true of a characterization by somebody dealing in guns or explosives as routine retail services. The problem with that is that if that person is doing it in circumstances where you satisfy the material support statute and you otherwise satisfy what you say are required elements of 2331, the characterization as routine retail services doesn't help us one bit. So that's the point of my comment. And I take the comment, but I do think that just underscores the error of not providing those statutory elements because, I mean, to take your example, it's not just the apparent intent to coerce a citizen population, which is part of the four-factor definition, but there's also the idea that the defendant's actions have to be either violent or inherently dangerous. Or dangerous to human life. Exactly. And I think right there that's probably one basis for distinguishing routine gun trafficking services and routine banking services. But I'm willing to grant you that you could have a case. I don't think it's this one. But you could have a case where even the provision of banking services, I think what you would have to show, frankly, and I think this would go both to the element and to the causation part, would be I think you would have to show that this was a bank that was willing to process transactions in situations that no one else would. Well, I'm not sure of that. I mean, we do have a situation where the jury made two findings, that the bank knew that it was transacting business for Hamas and that those transactions substantially supported the terrorist activities of Hamas. So with those two findings, aren't they the equivalent of a finding that the bank engaged in activities dangerous to human life? I don't think so, Your Honor. I do want to just — I think there is an important distinction. First of all, the proximate cause instruction said that they could find liability if they substantially contributed to. I don't think that's the same as substantial assistance, which I think is — Well, indeed, it might be a stiffer standard that they substantially contributed to it. They would have — but in any event, I'll let you make your argument. Yeah, I really don't think that's the case. I actually think, especially read in the context of the instruction, substantially contribute, I think actually is problematic language because it's supposed to be causation, not contribution, which I think is a lesser standard. Substantial assistance under the new JASTA provision, I think especially since the text told courts to interpret it is a much higher standard. But with that clarification, I don't think you can find from those two jury findings, which of course were profoundly influenced by the sanctions, which we think are inappropriate, and I'm happy to talk about that separately. But even putting the sanctions to one side for a second, I don't think those two findings get you there. I think they might be consistent with the finding, which is to say, if you think about the idea that there is some overlap in the Venn diagram between finding of material support under 2339B and the definition of international terrorism, I think those findings suggest that this is actually material support and therefore it could potentially satisfy the other four statutory elements, but I don't think those two findings alone remotely satisfy the other requirements of the statute. I certainly can imagine situations where a banking agency knew that it was giving money to terrorists, but nonetheless it didn't satisfy the statutory elements, and I could certainly see a jury could rationally find that properly instructed that yes, we think there is a violation of 2339B, but we don't think those additional statutory elements are satisfied on the record. At a minimum, you're saying this would have had to have been specifically charged. We can't assume it from the charge that was given. May I take a moment of your time to ask you about the appear-to-be-intended element? Sure. Courts have construed this not to be a mens rea of the actor, but rather the reaction of the persons who perceive it, so are we into a reasonable man standard here on that element? I think we probably are. Again, we didn't get to that point because we refused the evaluation. Right, but to the extent you want us to say that these are elements and that they had to be charged, I want to make sure I understand what you think had to be charged. So if it is indeed a reasonable person who has to be the template for this, is it as in other contexts where we use reasonable person analysis, an omniscient reasonable person? Do they know all of the facts and circumstances that the bank knew when it engaged in the transactions? I think this court could say that it's a reasonable observer reasonably informed. I think that's probably what I would suggest, but if the court thinks that the better standard is the reasonable observer who happens to be omniscient, I could live with that as well. The United States government's regulatory agencies, when they knew what they knew, thought that the bank was chargeable with certain violations of law respecting dealing with terrorism. How does that play into that other element, that appear to be intended element? With all due respect, I think you're over-reading the findings that were made. Well, it was a settlement, so I understand there are no findings. Right, and my client did not agree to the government's statement, and the government's statement was essentially with respect to the handling of OFAC lists with respect to the New York office. But it was not a finding that there was some facilitation of terrorism or anything like that. Again, I think it's worth looking at page 20 of the United States' brief to the Supreme Court in this case, because the United States government's last word, latest word, fully considering everything that happened with respect to the New York agency office, was that Arab Bank is a constructive partner in fighting terrorism financing. Let me stay on that regulatory proceedings point for a moment more. These were regulatory, not criminal proceedings, right? Right. And yet, am I right that it was in those proceedings that the bank turned over some information that it now says it can't turn over? Well, it turned over information in those proceedings that would also be protected by foreign bank privacy laws. I ask this, and it is more on the sanction point, because I thought from your brief that you were basically arguing that, well, we turned them over because that was more of a criminal proceeding, and so there are treaties, and that's why we thought that was appropriate. But I didn't understand it to be a criminal proceeding, so what am I missing there? I think what we tried to convey in our brief, and this is consistent with what the United States conveyed to the Supreme Court in its amicus brief, is that the distinction isn't criminal-civil. It's essentially government proceedings versus private litigation, because I think the understanding, not necessarily as black-letter law of Jordan or Lebanon or the U.K., but as a practical understanding that foreign governments are essentially more understanding of cooperation with foreign regulators on a government-to-government basis. You're not arguing that you have any exception under these bank secrecy laws for requests from foreign governments, right? No. I thought you were relying on the treaty that existed between Jordan and the United States that provided for criminal cooperation and saying, well, you know, they hadn't made the formal request, but we were halfway there. You're saying that the bank could draw a distinction government versus private, even though the bank secrecy laws don't draw that distinction. I am suggesting that, Your Honor. I'm not suggesting that with the benefit of 20-20 hindsight, if I were counseling the bank in real time, that I would have necessarily suggested that they just turn those documents over without checking with their home country regulators. But I do think two things are important. One is I think that that is not unusual in this space, which is to say I think banks that might be very leery about turning over documents in private litigation are probably quicker to cooperate with foreign regulators. Well, sure they are because they have an economic interest in cooperating with U.S. regulators because their branch or whatever it's called in New York is at risk, which is not as proximate a risk where there is a private litigant seeking the documents. But at the end of the day, what they had was an order of the United States court to turn over the documents. The only difference were the potential consequences of thumbing their nose at the regulatory agencies versus the U.S. court. With respect, Your Honor, I don't agree with that. I think that that's exactly the reasoning that the United States government was trying to address in its brief because I think the other big difference is that you essentially have the request for documents there being filtered through a U.S. agency that if the process is working right, they should be taking into account a variety of concerns, including the relationships with another country and the like. But that's precisely required before a U.S. court issues an order to produce where there's a bank secrecy statute invoked on the other side, even before you get to sanctions. I don't think the analysis is exactly the same, Your Honor, but I do think the United States government was exactly right on this, and I think it's a very important point, which is I think it is a mistake to say that while this bank cooperated with the U.S. government, therefore it doesn't really take these foreign bank laws seriously, and therefore we're going to punish them more severely than if they would have been more withholding vis-a-vis the U.S. government. I think that the federal government... What you're really saying is that the executive branch's views are in a preferred position on this issue vis-a-vis foreign banks than the judicial branch's views. I certainly wouldn't put it that way, Your Honor. I think that there is a way to reconcile that, of course, which is in the context of the civil litigation, the district court could have solicited the views of the United States at that point, and then maybe we would have had a better sense of what the executive branch's view is. It could have appeared if it thought all of this was so endangering its relations. I find it curious that the only place the United States has spoken is at the request of the Supreme Court and where its bottom line was to urge against the grant of certiorari review. If its view was that there was a serious error that was compromising United States foreign policy, maybe they wouldn't have thought that was the proper time to hear it, but certainly now or before the district court, I think it's been acknowledged that they've always been aware of the litigation, so why should we give it much weight at all when they don't come and appear? Well, I mean, I think the reason that you give it weight, I mean, I may have an undue respect for the views of the United States presented to the Supreme Court, but I think you give it weight because they did address for 13 pages the merits of the district court's analysis of the sanctions, and I think the proper course after, I think what the United States probably was counting on is that the district court would take that into account and perhaps rejigger the sanctions so they look more like the sanctions that the magistrate judge imposed and less like the sanctions that the district court judge imposed, and if the magistrate, to be clear, and I think this is also responsive to your point, Judge Kaplan, I mean, if the magistrate judge's sanctions were all that was at issue, I don't think I would have briefed the sanctions issue to you, I mean, which is to say this is not a situation, I'm not trying to argue that the bank should get off scot-free in this situation, but I do think that the fundamental problem when you look at the delta between the magistrate judge's sanctions and the district court judge's sanctions is, I think with respect, the district court judge approached my client as if it were any other recalcitrant party that wasn't turning over the documents because effectively they were lawless, and there wasn't really... She did make findings, I mean, there was a long course of history still of requests not complied with and repeated requests, and she, I don't recall whether she exactly found bad faith, but this was not a spotless record even before you got to the ultimate refusal. She did not find bad faith, Your Honor, I mean, she did say, you know, the argument was, of course, this was done in the utmost good faith, she questioned that, and, you know, I would say that there too, you know, the magistrate judge who had 13 hearings was very close to the back and forth on trying to get these documents, and the magistrate judge, I think, you know, made clear that, you know, there was one initial letter to one foreign government that was pretty begrudging, but after that, that language didn't reappear. So the findings on that, and again, you know, if you really want to look at what was done here, I mean, it would have been quicker if my clients had said, hey, foreign bankruptcy, foreign privacy, bank privacy laws, that's the end of it, can't do it, let's just move on. They actually engaged in some pretty extensive and time-consuming efforts, including getting a successful appellate decision out of the Jordanian judicial system, only to have it overturned at the next level by a bank client who thought so much about their bank privacy that they appealed that intermediate appellate court decision. The court was wrong in questioning their good faith? Well, I don't think, to be clear, I don't think that the district court premised the sanctions order on a finding of bad faith. I think the way I would read the opinion is she wasn't going to decide this case on the assumption that the defendants had behaved in the utmost good faith, and she said correctly, consistent with the precedent, that even in the case of the utmost good faith, some sanctions can be imposed. And so in the process of saying that she was going to impose some sanctions, she said this isn't even in a case where they acted with the utmost good faith. I mean, I'm not trying to disturb that finding. I am saying, though, that the magistrate judge got this right, and the district court judge, I do think, erred, and particularly at the point where it was allowed for there to be an inference, not just that there were transactions with individuals affiliated with terrorism, but that it was done with knowledge. I think that really skewed this in a very fundamental way. But the district court sanctions even went further, and this, I think, was really problematic, is that my clients were not allowed to explain to the jury at all why the documents weren't produced. Well, wasn't there an opportunity with respect to the Saudi committee accounts or one or two accounts as to which records had been produced to describe the compliance systems and how the bank operated to know who they were dealing with and so on? So didn't that give an opportunity that was adequate for the jury to look more broadly at the bank's practices? Absolutely not. There was some effort in response to the Saudi committee and to the account of Hamdan, one account that was turned over, to provide some context. But what there wasn't in any way an opportunity to do is to provide an explanation why the other documents were not turned over. And if you want to think about the prejudice to this, all you have to do is look at the plaintiff's closing argument, where they kept on talking about the documents that were hidden, the hidden documents concealed incriminating information, and we were not allowed even to say that the reason the documents were not produced was because of the compelling effect of the foreign law. Now, the jury could have still ruled against this if they had that... The district courts explained in part that she didn't want to have mini-trials on foreign law. And, I mean, isn't that correct, because we're debating here what was likely to have been enforced, what the scope of the law was, what the meaning of prior failure to seek sanctions for the disclosures, the unpermitted disclosures to the U.S. government? That could have been a tangent, couldn't it? Well, I mean, a necessary tangent for my client to have a fair chance to defend themselves in this circumstance is because to allow the plaintiff to go up there in closing and keep on talking about these incriminating hidden documents and not allow us to even say, wait a second, we had an obligation to not produce those documents that did not turn in any way on whether they were incriminating or not. We would have gotten into the jury hearing that you turned over documents in other circumstances where you didn't have permission and where they were covered by bank secrecy, and then you would have wanted to explain, yes, but we did that because it was a government request, and then there would have been the argument that Judge Kaplan suggested in response that, yes, but that's only because you were afraid they would, you know, shut you down, whereas the court didn't have that kind of authority over you. I mean, this would have gone back and forth and back and forth endlessly. Why wasn't the district court entitled to decide that that wasn't going to be the way this case proceeded? I think that if the district court judge wanted to avoid that, then perhaps the sanction order imposed by the magistrate judge would have avoided that. But you're on a very difficult standard of review on that. I mean, you're basically agreeing that there could be a sanction, but that the type of sanction imposed was not appropriate. That is what I'm arguing. I don't think it's a pure abuse. You're saying the sanction order that the magistrate said, which would have allowed you to say, oh, but the courts in Jordan won't let us do it or the courts in Saudi Arabia won't let us do it. And my point to you is there's a response to that, and then there's a counter response and on and on. It's not as if your response was nice and clean and it would have gone before the jury and that would have been the end of it. I think you could have, in theory, coupled the magistrate judge's sanction order, which I think could have avoided getting into a lot of this because it didn't allow an inference of knowledge that the transactions went to the terrorists. You know, the logical extension of your position is to essentially neuter district judges in foreign bank secrecy act cases with respect to discovery. The district judge, on your theory, is basically limited to, oh, you know, that really wasn't very nice kind of sanctions. Or, alternatively, to turn the whole thing into a year-long course at the Harvard Law School on discovery sanctions in cases with international ramifications. I've done enough of these to know. Well, I certainly defer to your experience, but I think that the magistrate judge had a way of dealing with this that imposed some sanction for not providing the records. Judge Weinstein had a way of dealing with this that imposed some consequences without getting into this. And I do think, I mean, I defer to you on what district court judges can do, but I think there's a way to provide an instruction on, you know, there could have been an agreed-upon instruction about the fact that these documents weren't turned over pursuant to the privacy laws of these nations. And the judge could have said, look, we're going to fight over this instruction, and I don't want to hear... Even though you had turned over things in violation of the privacy laws of the nation in other circumstances. What I'm envisioning, Your Honor, is an opportunity to fight over what that instruction says, and then the judge says, look, whatever the meets and bounds of that, whether they include that or not, I'm going to give that instruction, and I don't want to hear another word about this. I do not think that... But I'd have a worse argument, Your Honor. I don't think that the dilemma here is that the only way to provide the defendants with a meaningful opportunity to defend themselves is to have mini-trials. I mean, I have enough faith in... A meaningful opportunity to defend themselves was to produce the documents. With all due respect, Your Honor, I think that there has to be a little more sympathy afforded a defendant that is caught between the competing and irreconcilable demands of two sovereigns. But the point of the matter is that the judge below concluded that there was no irreconcilable conflict, that your client didn't have meaningful risk if it had simply produced the documents, that it had done so before in violation of the local law. Game over. And, Your Honor, that's the exact way of thinking about foreign law that this Court said was incorrect in in re vitamin C litigation. And this Court was right. I mean, in both those cases, you had a foreign sovereign coming into court and making clear that they took their law very seriously. We said that you had to defer to the foreign sovereign explicating its law, not the foreign... We never said anything about the foreign sovereign saying when it would enforce, when it wouldn't enforce the law. It's construction, construction of the law that we said you had to defer to the foreign sovereign. As I read the case, it said both construction and you don't second guess whether or not they would actually be prosecuted. And that's right in the vitamin C decision because the argument there was, yeah, you know, China has this system of chops and all of that, but you don't have to go through it. Lots of people didn't. And so it's really not compulsion. And as I read this Court's decision, it said, look, when China comes in and says, no, this is our law and we take it seriously, which is exactly what Jordan did here. It's exactly what the Palestine authorities did here. I mean, that's in the record, that these are their laws and they take them seriously and they would potentially criminally prosecute. I think it puts district courts in a horrible position if they're going to second guess that, especially when there is a third way. There is the way the magistrate judge who was closest to this dealt with it, which is to say, look, we're not going to treat this as if you provided everything, but we are going to recognize that you're not somebody who's just recalcitrant for no good reason and you're caught between the competing demands of two sovereigns. All right. We've kept you very long, but we did have questions, so thank you for taking them. Counsel? If I may please the Court, my name is Peter Raven Hanson. I represent the appellees and the plaintiffs in this action. I'd like to address proximate causation because Mr. Clement spent so much time on it, but first I think there's an important clarification I want to make. The bank has said that it might not survive this appeal. The case has settled, and the settlement was on terms agreeable to the bank as it told its shareholders. We saw what you put in your papers, the statement that they issued. The only addition we would emphasize is that this panel's decision will be the last decision in this litigation. The parties are agreed there will be no petitions for rehearing or for certiorari and no new trial, even should the case be remanded. So this is it. And where is that in the record? That is in our briefs where we say this panel's decision will be final, but we weren't clear on whether our italics would have conveyed that adequately to the courts on it. What's to prevent whichever side is dissatisfied with our ruling from petitioning for certiorari? The settlement agreement provides. To the settlement? It is, Your Honor. It is. Thank you. The proximate causation instruction that was given was in part this. The plaintiffs must show that the defendant's unlawful acts were a substantial factor in the sequence of events responsible for causing the plaintiff's injuries. Could you pause for just a second? Yes. So what effect does our panel's review and opinion have? If the court affirms, there will be one recovery by the plaintiffs. If it disposes of the case in any other way, there will be a different recovery. The differences are substantial and related closely to the unliquidated damages in this case, so they do present a case in controversy. That presupposes there are just two ways that might come out. Well, the settlement agreement covers the alternatives. So a decision, for instance, that the charge was not adequate and that the elements should have been charged would not result in a new trial. It would result in the parties defaulting to a settlement? That's correct, Your Honor. Mr. Clement, you'll tell us whether that is the way your client understands it as well. Thank you. Well, my question then becomes whether there's really an element of an advisory opinion here. Your Honor, this Court has taken an appeal in a high-low settlement case previously in Runner v. National New York Stock Exchange. The citation for that is 568 Fed 3rd 383. It doesn't discuss jurisdiction. It just assumes it. Other circuits have also dealt with high-low settlement agreements and have concluded that so long as the difference in the amounts is not arbitrary but has a relationship to the unliquidated damages, it does present a true case in controversy. You know, I may be just misremembering because it's decades ago, but I seem to be remembering a case in the Federal Circuit or its predecessor, to give you an idea how long ago it is, that I was involved in on appeal where there was, as I remember it, a similar kind of settlement, and the Federal Circuit said no jurisdiction out of here. If I'm remembering accurately, the name of the case was Technicon. I'm not familiar with the case, Your Honor. Can I ask you, because I'm going to confess if it's part of the record, I didn't look at it. Do we have the settlement in the record? No, you don't. Plays with no objection to submitting it, but you do not have the settlement in the record. We may very well ask you to submit that and make that a part of the record if this is its effect on our judgment. Okay, let's hear you. Just the rest of the instruction, the pertinent part at least. In other words, the unlawful activity at issue must be a substantial and identifiable cause of the injury that the plaintiff's claimed. Activities that are too remote, too indirect, or too attenuated are insufficient. So let me give you an example of what Mr. Clement says is too indirect under that instruction to the jury. The record shows that Abbas Al-Sayed, who was the mastermind of the Park Hotel bombing that killed or injured 190 people attending a Seder dinner, and who was convicted of that and serving 34 life sentences for it, confessed that he held an account with Arab Bank and that he drew on that account to purchase military weapons in support of Hamas military activities. We have transfer documents that show that he received at least $123,000 of that account, 54 of them in the year before the attack. The bank argues that's not enough because we can't show, and haven't shown that he drew on the account to purchase the suicide vest that was used in the Park Hotel bombing. All we can show is that he drew on it to buy military weapons for Hamas. They also say that, you know, we have nothing else that ties him to the attack. But they've never produced his account records. They have never produced the account records for any of the 24 suicide bombers or 145 Hamas operatives that worked with him that we've identified by name in the transfer sheets. But those are all people as to which there are admissions that there were accounts? No, but we have transfer, wire transfers in their name, so they received money, and we have recently. For the bank, too, then? Yes. So that was one of the difficulties we faced with the but-for theory that the bank has advanced. In fact, on the but-for theory, if I heard Mr. Clement correctly, even if we could show that Mr. al-Sayed had purchased the suicide vest for the Park Hotel bombing, he would say, well, that's not but-for because he could have gotten that money from another bank. That can't be the law here, and it isn't, not in a case where fungible money is the financial service that is being provided as material support to Hamas. The applicable law. Excuse me, the financial services I understood to be wire transfers and holding money and making money available for transfer, but not providing currency, not providing dollars as a contribution to an entity. But you were just saying money is fungible. Financial services don't seem to be fungible because they are traceable. They're associated with an institution. The flow happens according to various protocols, and I don't see them as fungible. So am I misunderstanding? Well, the financial services deliver money to the ultimate foreign terrorist organization here, Hamas. They can do so by wire transfers. They can do so by holding accounts from which people can draw. They can do so by transferring between accounts, and they can do so as they did with Osama Hamdan. The bank can actually give money back to him after knowing that he's a specially designated global terrorist. But that's refunding from an account. That's not like making a contribution. It's not a donation, Your Honor. Certainly we agree with that, but it's material support for Hamas. It's money, fungible accounts, fungible money that is given to Hamas for the support of its military activities. Do you think financial services are also fungible as money is? I think the money that transfers through financial services is fungible. But I would add also that one of the financial services that the bank provided here is a highly unusual one. It paid martyrs' payments to the families of suicide bombers and others who were injured or captured as prisoners during the Second Intifada. These were paid in cash to non-customers in many instances on the basis of sheets that had been prepared by Hamas-controlled charities that listed the cause of death as martyrdom operation, which the bank employee translated as suicide operation. Now, that's not routine banking. And, in fact, the bank's compliance officer in the United Kingdom said he would never have processed these in a million years, video testimony that the jury saw. So it simply isn't the case. I want to understand you briefly correctly that the source of some of the money was an individual who did not have an account at the Arab Bank. Was that your position, that at both ends there was not an account holder? Some of the recipients of the martyrs' payments were non-customers, as I just indicated. No, I understood the recipient. But didn't you take the position that one of the sources of some of the money was not a customer either? I don't believe so. I misunderstood. I may be incorrect on that, Your Honor, but I don't believe so. There was one individual named Al Hayek in Lebanon through whom I think upwards of 200 transfers passed, including transfers to Sheikh Hasim, the iconic founder of Hamas. I believe he had an account, but I can't say that to a certainty. And I can't say that in part because they never produced any accounts for anyone except Osama Hamdan. Was that if you were taking the position that neither end of a transaction had a customer, then I wasn't sure that this was a problem for the bank in terms of bank secrecy, but maybe I misunderstood your argument. No, there were many recipients who held accounts. There were also many, especially recipients of the martyrs' payments, who did not, which is one of the reasons that we describe this as non-routine banking. So the proximate cause problem that we face is not really in foreseeability. It's not the foreseeability of the risk, notwithstanding what Mr. Clement said. When you pay millions of dollars to Hamas in the very period when suicide attacks are spiking, and the bank stipulated that all 24 attacks at issue here were acts of international terrorism, so we're not questioning whether terrorism was taking place. When you do that, it's a reasonably foreseeable risk that Hamas will perpetrate these attacks. Our court has said that this liability, at least before the recent amendment of the statute, could not be secondary. It had to be primary. Yes. So to that extent, doesn't it have to be your clients' actions that have to satisfy the definition of international terrorism? Yes. Under the theory of primary liability, setting JASTA aside for a moment, which we think provides an alternative legal theory here, it is our client who has to commit an act of international terrorism. But as Your Honor pointed out, the statute doesn't say that that act must itself be violent or dangerous to human life, although I would argue that giving millions to Hamas is. It says that it's an activity that involves acts that would be dangerous to human life. Right, but usually involves means that the violent activity would be a subset of the activities that are international terrorism, not the other way around. And so I'm not sure how the violent acts, or I'm not sure how the bank transfers involve violent acts. Help me out with that. Well, I would say they involve acts that are dangerous to human life when they are knowingly given to an organization that is engaged in terrorist activity, which is the 2339B standard. Hamas was engaged in terrorist activity in the Second Intifada, virtually daily terrorist attacks, including these 24 admitted acts of international terrorism. When you're feeding money to an active organization in terrorism, it's an activity that involves danger to human life, namely the danger that the recipient of the money commits. That argument has been made and accepted with respect to donors, but of course this was not the bank's money. This was money from other people they were transferring. How does the transfer involve endanger human life? Tell me your theory on that. In exactly the same way that the donation involves danger to human life, it gives Hamas the means to conduct the terrorist attacks and to continue engaging in terrorist activity. That's the whole purpose of the material support statute. We know that because Congress said that one purpose was to interdict the flow of money. Some courts have decided that that doesn't even have to be charged to a jury. As long as there's material support for a terrorist organization, that's enough. But why should we accept that? Mr. Clement argues that it should have been specifically charged to the jury and they should have found it as a matter of fact. I would offer two reasons. First of all, in all 2339B violations, we would argue that the activity involving violence and the apparent intent are satisfied because Congress found that any contribution to a foreign terrorist organization facilitates its terrorist activity. That doesn't necessarily mean that the activity involves acts dangerous to human life. I mean there have been a lot of courts that have pondered about this when the terrorist activities, the terrorist organization also builds hospitals and does training for advocacy and a host of other things. Why should this be as a matter of law enough to prove that it was material support for Hamas? For the reasons that the Supreme Court stated in Holder, the Congressional finding is that any contribution to a foreign terrorist organization facilitates terrorist activity, even if the contribution is for social activity. And if it facilitates terrorist activity, that may be different from whether the activity that the material supporter is engaged in involves violent acts or acts dangerous to human life. We would argue that if an activity facilitates terrorist activity, that it involves the terrorist activity. There's not a meaningful distinction there. Congress's purpose was to prevent any dollars flowing through to Hamas, whether they're for martyrs or for social activities in kindergartens or they're directly for terrorist activities, because Hamas has no accounting mechanism that enables us to distinguish one from the other. Therefore, every dollar is spent to kill people. And that's a reason that any 2339B violation would satisfy the apparent intent and involve the requirement as a matter of law. But in the alternative, Mr. Clement did concede in response to Your Honor's questions that there's a subset of 2339B violations that always, as a matter of law, satisfies the use of requirements. We'd argue that no matter how you define that subset, this case lies within it. I'm not sure he conceded that it would always be. I think he recognized that there are some that he says could as a matter of law. He's not arguing that as a matter of law, you can't be convicted of 2339B and be found to have engaged in terrorism. It's possible. But let's deal with the appear to be intended. Do you two think that that's a reasonable observer of the activity, that that's who we would focus on? A reasonable observer who knows that the bank has violated 2339B. Well, they would make the findings that they violated. They would have had to do that to get past A. Because their activity has to be a violation of the criminal laws of the United States. That's correct. It reached B after having reached A, presumably, and that activity would have to appear to be intended to intimidate populations, to influence government, or to affect the conduct of government. So how does being the bank that gets the money from the donor to the terrorist recipient send a signal to the observer that the bank is trying to intimidate or coerce a civilian population or influence the policies of government? To answer your question, Your Honor, may I go back to step one for a moment? The 2331 defines acts of international terrorism to include any criminal violation of federal or state law. So there's a huge range of potential predicate crimes. One, for example, might be 18 U.S.C. 1111, which makes it a crime to murder an American abroad that is planned from the United States. Suppose the spouse of the murdered victim rings an ATA, Anti-Terrorism Act, action against the defendant in such a case. There is nothing in the predicate crime that ties it to terrorism. So in that case, you would have to independently show the apparent intent to accomplish one of the terrorist purposes. And there are a host of other state, almost all the state crimes certainly, and federal crimes likewise have no terrorist component. But 2339B requires the defendant, in order to be found guilty of the crime, to know that he is providing support for a foreign terrorist organization, an organization engaged in terrorist activity and in terrorism. And when you know that, then from an outside observer to see that even though you know that, you continue to supply money to the terrorist or the terrorist organization, it's at least one apparent intent that you are supporting the activities and the goals of that terrorist organization. Supply food? Food is the same, Your Honor, because Congress... Basically, you supply any service other than the specific ones, medicine, etc., that are specifically accepted by statute, and you can be liable for having violated criminal laws that involve a violent act and that appear to be intended to intimidate, influence, or affect. That is exactly what Congress found when it said that any contribution of any kind to a foreign terrorist organization facilitates its criminal conduct, which is terrorism. But in the alternative, we would argue that if it's only a subset of... What violation of the United States criminal laws do you envision that would not be, per se, satisfactory here that the jury would have to make findings? Because I'm concerned that what you're basically saying is that Congress identified these elements, but they're always satisfied. What's... No, Your Honor, I'm saying they're always... When would there be a terrorist, an activity involving danger to human life, that would still have to satisfy these? I mentioned 18 U.S.C. section 1111. That prohibits the murder of Americans abroad. Without regard to it being terrorism. Right, there's no element of terrorism in there. And there are others as well, kidnapping, planning a kidnapping of an American abroad. In fact, Congress's concern may be reflected in the statute that passed just a few years before it adopted the ATA, which is 18 U.S.C. 2332. That also deals with the murder of Americans abroad. But the legislative history says we don't mean to enable terrorism prosecutions for ordinary street crimes in Bogota. If a taxi cab driver, you know, robs an American or kills an American, we don't mean that you should be prosecuted under this section. Therefore, we require that before prosecution can proceed under 2332, the Attorney General certify that a purpose of the crime was one of the terrorist purposes that we've been discussing. So Congress was already aware of the need to distinguish terror crimes from non-terrorism crimes when it enacted the ATA. And our argument is, our first argument is that 2339B violations will always satisfy apparent intent because it's inherently a terrorism crime. And the knowledge requirement is knowledge that you are supplying money to a foreign terrorist organization or an organization engaged in terrorist activity or engaged in terrorism. Terrorism, terrorism, terrorism. That is the predicate crime. And therefore, you shouldn't have to, again... I understand that the knowledge that a defendant bank would have, that it is facilitating the financial transactions of a terrorist organization, that is enough, you think, for the observer, reasonable observer, omniscient, or knowing those facts to conclude that the activity appears to be intended to intimidate or influence policy. Yes, that is our argument. But the alternative argument is that if there's only a subset of 2339B violations for which this is true, this case falls within them. In this case, the bank did not dispute that it had paid $2.5 million to 11 U.S.-designated Palestinian terrorists, and it did not dispute that all of the attacks that injured the plaintiffs were acts of international terrorism. That was stipulated before the trial even began. In that case, if you know that you're supplying money to an organization engaged in terrorist activity, when you just... You have to be careful. They are not giving money. Well, I didn't say giving. They are supplying it, Your Honor, because they are delivering it to the accounts of senior Hamas... It's not the same as... They're not donating it. They are the... It's their money, and they're choosing to give it. Absolutely, Your Honor. They're not donating it, they're not contributing their own money, but they are supplying it by putting it in the accounts of the Hamas individuals who they, according to the jury's findings, know to be Hamas. An example is Sheikh Yassin. Sheikh Yassin and his wife... They didn't have to make that finding with respect to each account, right? No. It was given a careful instruction on knowledge and conscious avoidance and told that it had to find that the support was for Hamas in one of the three forms of knowledge that 2339b describes, which either knowledge that it was a designated FTO, foreign terrorist organization, knowledge that it was engaged in terrorist activity, or knowledge that it was engaged in terrorism. And it made that finding. The logic of your position, I think, would require the result that if a shipping company, knowing that the consignor was... I forget. It doesn't matter who the consignor is. Took a consignment of rockets and knowingly delivered them to Hamas without ever taking title. That's material support. It's a terrorist act in and of itself. If Congress was asked, does knowingly delivering rockets to Hamas in the middle of the Second Intifada constitute an act of international terrorism, I think the answer would be yes. If you knowingly deliver rockets in the middle of daily terrorist attacks to the primary terrorist organization and you know that that's what you're doing, yes. It would appear to be that you were supporting Hamas's efforts. It's routine transportation services. It's not routine the minute you know that you're sending rockets to Hamas, Your Honor. As Your Honor pointed out earlier, knowledge is what takes this out of routine banking. And it's also what protects routine banks. The banks that don't know that they're dealing with Hamas and are not consciously avoiding that have no liability. And you would say that this is sufficient to create liability generally with regard to all terrorist acts that occurred during this period in which they were providing financial services? Or would you deal otherwise with it by reason of language in 2330? Well, they would have to show both causation and fact under the substantial factor version of causation and have to show reasonable foreseeability. And they would also have to find, of course, as the predicate 2339B crime, that they're dealing with a foreign terrorist organization. Hamas had been designated as such since 1997. Not all terrorists in Israel are designated. But the liability is complete once causation is established as well. That's independent of our discussion of 2339B. But there has to be both causation and fact as well as proximate cause. Yes. Because you're saying that it's not but-for causation. That's correct. We're just saying that causation and fact is a requirement that we concede is applicable here, but that the background principles of tort law make but-for causation just one form of causation and fact, and that when there are multiple causes that we can't trace to any one perpetrator, then substantial assistance is the alternative background principle. In Paroline, the Supreme Court used a more relaxed causation standard given in very specific circumstances. But Burge tends to teach that but-for is a different and more heightened type of causation that has to be proved, that absent the activities of the defendant, the wrong would not have been consummated. Why should we reject the normal rule, the default rule? Well, both in Nassar and Burge and Paroline, which is the last in that sequence of Supreme Court cases, the court mentioned that but-for causation is ordinarily the causation and fact. In an intersection collision, it's not an issue. But it also said in all three cases that it's not the only background tort principle applicable here, and if there are multiple causes that can't be traced in a but-for sense to the perpetrators, then to apply strict but-for causation would allow all of them to go free. And in that case, the tort law had provided an alternative principle. And that's what we say this case is. The bank says, well, wait a minute, that's only for fires that jointly start. I mean, three causes of fire that jointly start a fire. I think the hypo is not quite accurate. Assume three gas station owners who knowingly sell gas to an arsonist who is making Molotov cocktails in the middle of a riot. He then goes and starts a fire with one of them. Under Mr. Clement's theory of but-for causation, all three gas station owners go free. Nobody is liable because we can't trace fungible gas to any one station. Under the theory, the alternative theory that the Supreme Court has now endorsed three times in a row in dictum, but clear dictum, if any gas station owner had supplied enough gas, then they could be liable on the multiple causation theory. We think the same thing holds true here for dollars and electronic transfers of funds. We can't trace Mr. Abbas al-Sayed's spending of money for a suicide vest in the Park Hotel bombing precisely to his Arab bank account. Although, boy, we come close if he says he was drawing on that account to support Hamas military activities. But we can say that this would be a substantial factor, as were other huge transfers of money to Hamas during the relevant period in the natural chain of causation. You would say there was a substantial factor causation that standard was met with regard to all the 24 events that occurred? That's correct, Your Honor. Yes, we would argue. Merely by providing generally financial transfers? Well, it's not mere, Your Honor. I mean, the transfers were in the multimillion dollars, and they peaked in 2001 and 2002, the period during which most of these attacks took place. Many of them we can trace by the wire transfer documents to 24 suicide bombers and 145 operatives who work with them. We know to have done so by reason of conviction and elsewhere. We just can't make the last connection for another reason here. My gas station hypothetical, maybe we would at least have the gas station receipts. We haven't received a single account record from any Hamas suicide bomber or any of the 145 operatives. The only account records that were ever disclosed were those for Osama Hamdan, and they are telling, and they are ones on which I think the jury drew its inferences because they show that transfers were made listing the beneficial customer as Hamas in English and were approved by the deputy manager of operations. The account number was used on Hamas's website to raise money, and Osama Hamdan was the leading spokesperson for Hamas in Lebanon who went to CNN to take Hamas credit for the Park Hotel bombing. If that's the only account record we have, the jury naturally would say, well, what about the 10 other, especially a designated Palestinian terrorist that the bank has admitted having? Wouldn't the account record for at least some of those 10 look like the ones we saw from Osama Hamdan? That's the inference that the bank, I'm sorry, that the jury drew, and one of the reasons we know that I'm happy about that because that gets to the sanctions argument. If I understood Mr. Clement, the concern they have is that they were presented to the jury as if they had just dug in their heels and defiantly refused to produce the records and that they thought the jury should at least have heard about the efforts they did make to get the records. And my question to you is, why wouldn't some instruction, avoid five weeks of trials, but give five sentences to the jury that basically said they were ordered by the court to turn it over, they're in possession, they have refused to do so, they're invoking a bank law, they have not always obeyed the bank law in the past, in this case they went to the courts and did try to get permission, they did not get permission, and whatever other facts, but lay those out to the jury and then each side makes its argument, because even you acknowledged that it was a permissible, not a mandatory inference, and in making its decision as to whether to draw the inference or not, wasn't the jury entitled to know about the extent of their defiance, because that might have been pertinent to what they were trying to hide? Well, Your Honor, first of all, the inference instruction that we proposed would be that the jury could draw the inference from the credible evidence that we have produced, not that it should be drawn from the bank's refusal to produce documents. It was the bank that said, no, let's go back to that phraseology, an inference based on a refusal to produce documents. So in that sense, at least, they are the architects of their own predicament. I don't mean that they accept it. You weren't looking for an inference at all? No, we were looking for an inference, but the inference... The instruction you just said is you could draw from the credible evidence. That meant the materials that were in evidence. Exactly correct, Your Honor. Right, and so that suggests there's no inference. That's a fact-finding inference that the jury would draw normally, but we wanted them to be alerted to the credible evidence, and that was the language that we proposed. How would an instruction that they could base their verdict on the credible evidence have allowed them to draw an adverse inference? The instruction would have been that you were permitted, based on the credible evidence the plaintiffs have produced, to infer the following statements. And the reason we weren't looking for that instruction was that we wanted the jury to be able to infer from the Hamdan account, the only one that was produced, that the other accounts might contain similar evidence. We wanted the inference. Yes, we wanted that inference. The argument you made to me suggested to me that you were suggesting you hadn't asked for an inference. No, no, Your Honor, we wanted the inference, but I'm also saying it's an inference that the jury would inevitably, would naturally draw anyway, underscoring it. Aren't they entitled to know the circumstances so that they know how the withholding, what the withholding bespeaks? Well, the problem with that is the same one Your Honor pointed out earlier in response to Mr. Clement, is that there's no stopping point on that. So are they to be told that the bank has refused to produce documents because it says its own law makes it criminal and it'll be prosecuted? Or are they also to be told, I think we'd be fairly entitled to, but they did produce those documents in violation of their own law. Incidentally, the documents were mainly from Palestine. The Palestinian banking authorities have represented to this court that its law is pretty straightforward. Absent a customer waiver or an order of the Palestinian court, quote unquote, any disclosure is a clear violation of the banking laws of Palestine. It seems to me that this might all be very important to us if there were a chance that a decision on other points could result in a remand and the district court had to decide this, but you've told us that will never happen. Well, I felt I had to make that disclosure to Your Honor to make the record clear. Indeed. Anything else? No. All right. Thank you. We'll hear from you, Mr. Clement. Rebuttal? Thank you, Your Honor. Just a few points in rebuttal. First of all, I mean, in terms of the settlement, I don't understand the settlement radically different from my friend on the other side. I mean, I do think that this court has jurisdiction. There's a number of different contingencies in the settlement, and indeed, I think the settlement would collapse if this court didn't exercise jurisdiction, so it's a little bit of a puzzle. Seeing the settlement, it's hard for us to know, but we'll probably ask for further papers on this. Let me let you make anything else you want to say in rebuttal. Sure. I really have three other points I'd like to make. I think it's the colloquy made clear. My friend's position takes you to an absurd position that if the American Red Cross wants to provide food to everybody in the Palestine territories at the relevant time, that it's potentially liable under the same theory that they're offering here, which is that's material support. Material support, ipso facto, satisfies all four conditions, and that is just crazy, and that problem is going to be fixed prospectively because the Section D added by JASTA provides a good mechanism to separate the sheep from goats, and their theory that all you have to do is show material support, and that's the end of it, is not met for that task. Judge Kaplan, it wouldn't have to be the shipping company shipping boxes of rockets. It could be shipping boxes of bread or boxes of fuel, and the same logic, that's material support and nothing else would matter. And then, of course, to bring it closer to the analogy to this case, if there were a well-established protocol for shipping companies to make sure that they weren't providing these kind of things to terrorists, and there were lists that they were supposed to check them against, and they did all that, and they checked the lists, and they nonetheless delivered some goods to some people who weren't on any list at the time, but later turned out to be terrorists, that would be enough to impose liability. And that's what we're talking about here, as to these three bombings, the 24 people were not on any lists until they were dead because they were involved in the terrorist attacks. So keep in mind that what we're talking about here is not the knowing provision of funds or financial services to Hamas, knowing full well that these are Hamas people, but it's providing financial services to 12 charities, none of whom were listed at the time, and at the time of the relevant events, 9 of the 12 charities were processing USAID funds. So this is really kind of this sort of retroactive gotcha that you provided services to people who weren't on the lists that you were supposed to check, and then after the fact they turn out to be terrorists, therefore you provided support to Hamas, in part because of the instructions that the jury was given, the adverse instructions. They find knowingness, and that's supposed to be enough to impose liability. That's very problematic. Just two other very brief kind of specific points. You heard a lot about this Hamdan record, and the jury heard the very damning testimony that when Hamdan's account was first opened up and there were transactions, he wasn't on a list. He later was put on a list. Now that sounds pretty good. And then at the point he's put on the list, Arab Bank closes the account. So far that sounds pretty good. But what they were allowed to tell the jury to make Arab Bank not look good is that after they knew he was a listed terrorist, they gave his money back to him. But of course what the jury wasn't allowed to be told by my clients is they only did that because the law of the jurisdiction, Lebanon, required them to do that. Now that obviously is something that puts the fact that the money was returned in a very different light, but that was kept from the jury under this general rubric that the jury can't hear anything about foreign law. The last point is you've heard a lot about the Saudi martyr payments. Two things just to contextualize that. One is this is the same program that Colin Powell went on Meet the Press or Face the Nation and said was a fine program. So this is not something that only Arab Bank would have gotten involved in processing and that somehow this was obvious from the get-go that this was hugely problematic. How was it denominated? I mean, we're hearing it as, you know, pay the martyrs program, but how was it denominated by the Secretary of State? Was he at that time? Yes, he was, I believe. And he was either in office or had just left. And it was denominated as a humanitarian aid program to people in this admittedly war-torn area. And so that's the way that it was understood. But the last point I'll leave you with is that's the one place they got the records. They got 180,000 pages of records. And, again, the 24 individuals. Were you allowed to put in the evidence that the United States officials described it as an excellent program? I don't think we were, but I'd have to check that, Your Honor. But I guess the one thing I did want to leave you with is the idea that as to those 180,000 pages of records where they got all the recipients, none of the 24 individuals involved in these bombings were honest with us. What if any offers of proof were made specifically with respect to the evidence that you say shouldn't have been kept out? I think there were offers of proof that were made. Where would we find them? Read the whole record, 7,000 pages? If you'll allow me, I'll try to get you that in a supplemental letter. I don't have it at the ready. All right. We are going to ask for supplemental materials. First, we want a copy of the settlement agreement. And, second, we will ask for a letter brief, 10 pages, double-spaced, on why we have jurisdiction in light of whatever the settlement agreement says. And then, Mr. Clement, if you could give us, if not an exhaustive, at least an illustrative citation, two pages in the record where proffers were made about this material. Mr. Clement, one more question for you. You've argued many points as errors here. Am I correct that your position in light of this settlement is once we identify one, we're done? Because if we were to identify anything on which this case would have to be either retried or reversed or anything, you're going to the settlement? Well, I think our position is that you would dispose of it. And we can obviously elaborate this on the letter brief. But I think our position is you would dispose of this as you would in any other case if there were a remand. I'm not sure why we would want to do that. I mean, if we were to decide, for instance, that, yes, you were entitled to a charge that told the jury all the elements of a terrorist act. They weren't told that here. Are we done? Because there's not going to be a retrial here. Why should we get into causation, but-for causation, the sanction? Or pick any one of those along the line and say we identified that error. Why would we need to discuss any of the others? I don't know that you would, Your Honor. I was just — what I was suggesting is, for example, I think the fact that you found an instructional error on the failure to instruct on the four statutory elements wouldn't, I don't think in the normal course, preclude you from actually needing to consider the JMAL. Because if we're right on the JMAL issue about but-for causation, there would be no new trial. Then we might pick, you know, the one we're most comfortable with. But it seems to me if we were to agree with you on any one, we're done. Well, again, I would just repeat the caveat that I don't think that follows in the sense that if you agreed with us on a new trial issue, I don't think that would obviate the normal ability and, in fact, requirement for you to consider the JMAL. But I think what's bothering Judge Radley, and she's more than capable of speaking for herself, but as I understand it, and it bothers me as well, we don't sit here to provide opinions to fit into some settlement agreement that the parties have. I have questions as to whether we should be deciding anything. But even if I get over that hurdle, I'm not sure I understand why we should go any further. In this case, if, for example, we find an instructional error on your first point, to resolve the question of whether there was instructional error on causation, whether the evidence was sufficient on a correct instruction, whether the sanctions involved an abuse of discretion, which we might very well do if there was to be a new trial. And I don't mean to belabor the point, Your Honor. What I would simply say is I think with respect to the new trial issues, once you decide that there is a new trial issue, then I think it's always a matter of prudence for the Court to decide whether it wants to reach other alternative grounds for a new trial. And the fact that there isn't is a prudential factor, I think, that you could use. I don't think, though, that that would be a reason not to consider a JMAL issue, because in my conception of this, in every case, you know, you have to sort of address the JMAL issue, even if you've decided there's a new trial, because granted, the JMAL would essentially obviate the need for any trial. Obviously, as this exchange shows, I think we were not aware of this settlement or the fact that it was going to obviate the need for a new trial in preparing for this argument today. So to the extent you're going to argue that we do have jurisdiction despite the settlement, I would ask you to assume, and it is an assumption, we've made no decisions, that we're assuming that if we identify one error, we're done. And if you don't agree with that, please tell us why. Of course, we may find no error, which is another matter altogether. But if you don't agree with the fact that in light of the settlement, all we have to do is find one error, and please tell us why. Okay? Thank you very much. Thank you to both sides. We kept you a long time, but we did want to make sure our questions were answered. The other two cases on our calendar today are submitted. We stand adjourned.